at all. Oral argument not to exceed 15 minutes per side. Mr. Sir, you may proceed for the appellants. Good morning, your honors. If I can reserve three minutes. Very well. Thank you. Daniel Sir, along with my colleagues, Rebecca Strauss and Brett Swearengin, are  also my client who made the drive down, Dr. Michael Hubert, this morning. So Livingston and Wayne-Leslon are two school districts motivated by compassion for vulnerable children to support a Head Start program. Before you get into the facts, I just need to understand the lay of the land right now. We've got two injunctions, one in Texas, one in Louisiana, that have enjoined Head Start in 25 states, I believe, for both the vaccine and the mask mandate. Correct, your honor. Okay. And four of those states are in our circuit. The only state right now not under an injunction is Michigan, which is where you're bringing the suit. And you've got an appeal right now in the 5th circuit of the Louisiana case. I actually represent one of the parties in that case, your honor. Okay. And then you also recently had a decision, there's a decision out of the Eastern District of Virginia, I represent the plaintiff in that case as well, that was decided on essentially mootness or standing grounds, not on the merits. Okay, it only went to mootness or standing, the plaintiff didn't have standing. My plaintiff didn't get fired. And have you filed an appeal in the 4th circuit on that one? We have, your honor, and it's currently in briefing. Okay, so you're in briefing in both the 4th and the 5th circuit right now? Correct. Is there any other case out there that we should be aware of dealing with a mandate? Not that I'm aware of, no. And I should note, too, the mask portion of the rule has been repealed by the department? Yeah, okay, so the mask portion has been repealed, the vaccine mandate has not been repealed. Correct. And so, as I understand it, the position is that the interim rule is still in effect, the secretary believes it has the interim rule still in effect with respect to the vaccine mandate. In fact, I would say the mask rule, the final rule on the masking is very particular in saying the vaccine portion of the interim final rule remains in effect. In effect, okay. Now, your clients have had to deal with not having, they haven't had an injunction in effect in their litigation, so how are they, didn't they have to go ahead and have the vaccines? I mean, is there anything left here, aren't your claims moot at this point? Why are they not moot? Because presumably, has Head Start required, HHSS required your clients to get the vaccines? No, actually, Your Honor, the irreparable harm continues. So what we have in the record is the testimony of Dr. Hubert Below that this would affect his staffing in several ways, both his current workforce and then people he may try to hire. And I can say informally that that has come to pass, that they have arranged their classrooms in a way that maintains their current staffing, but that they have had to turn away job candidates, that they've had to turn away internship candidates, that they've had to turn away parent volunteer candidates because of this mandate, and that also plans that they have to grow the program have been put on pause because of the workforce. Currently, all the employees and volunteers at the Head Start programs you're representing in Michigan, they've all been vaccinated, all of those, all that staff that are on, that are working right now, presumably. The employees who are working with children covered by the program are in compliance. Okay, so your continuing injury is that you're being deterred from hiring other people that would not have been vaccinated to be staff or volunteers? Correct, Your Honor. Okay, and what... And unable to continue growing the program. What percentage of your staff, I'm sorry, these are just facts that have just been whirling around my head, but what percentage of the staff generally are volunteers versus paid people? So all the staff are paid people. Okay. But these programs rely on a large number of volunteers, especially parent volunteers. Right. I don't know the specifics to my school district. I can say nationally that there are about 280,000 teachers and 1.1 million volunteers in the Head Start program. And the vaccine mandate goes to both the staff and the volunteers? And to contractors who are in the space as well, but yeah. Okay, so all volunteers would have to get that. So obviously you're arguing, I guess, you're deterred to get volunteers because of the vaccine mandate. Correct. We're unable to get volunteers, interns, and we're unable to grow our programs as we would otherwise because we're not able to hire teachers. I'm sorry, go ahead. And contractors are covered by this mandate or by the mandate that was struck down last year? They're covered by this mandate because they're contractors to the local Head Start agency. So I would say even if they're not covered by this court's previous ruling, they would still be covered by this separate rule because they're contractors to the agency. I've got more questions about facts here. So we've had a year now where half the country has been enjoined from having this mandate and the other half of the country has not been enjoined, which raises the question of kind of a natural experiment actually for economists when you have a year of half of the country under one mandate and half of another. What effect has that had? Has there been any study done to see what's happened at the Head Start programs where they didn't have a vaccine mandate versus the ones where they have had a vaccine mandate? I'm not aware of any study, Your Honor. Okay. And should the standard be when we're looking at injunctive relief, what the current state of the world is or what the state of the world was when the injunction was denied? That is a great question. Amazingly, I'm not sure I can point to a particular precedent answering it. I think how I would answer it is that when we presented the motion pending appeal, that that would be determined at the time the motion was made. But then on an appeal of a preliminary injunction, the question this court is asking is did the district court abuse its discretion? And so the only way to look at whether the district court abused its discretion is to look at the record that was in front of the district court at the time. So I would say yes, on a preliminary injunction appeal, the facts are frozen at the time that the district court rendered its ruling. Except that your claim could become moot if your harm disappeared. And here your harm has at least changed. I would say my clients are managing as best they can to... Are you fully staffed? My clients are fully staffed at, in terms of the teachers in the classroom, my clients have been able to arrange the students that they have in a way that they have not had to lay anybody off, but they have also not been able to move forward with plans for growth because they have been unable to fill those slots. It might still be harm, but maybe different harm than it was at the time? I think most importantly, the government has not argued that this case is moot. The government has not raised in its briefing or in the motion. It is jurisdictional, correct. But I would at least take under consideration the fact that the government has not raised in its briefing that this case is moot. It is, again, just kind of mechanics of how it is all going down. You are saying that even though half the country is under a vaccine mandate that has not been enjoined, that Head Start has not been actually enforcing the vaccine mandate? Is that what you are saying or what has been going on? No, Your Honor. So Head Start told the New York Times that it would not enforce the vaccine mandate? Honestly, I think it is incredibly frustrating for my clients and for others in other states that on the one hand the government comes in and swears this is an emergency, all the equities are on our side and this PI appeal because we have to keep these kids safe. And then at the same time the government doesn't appeal when half of its mandate is enjoined in half the country. So normally they would be collaterally stopped, right, under government. Mendoza. I mean, that is the law. That is my understanding, Your Honor. And so in this instance I think the reality is my clients deal with this every day, that there is a workforce shortage in education in general, there is a workforce shortage in Michigan in general, and that this is exacerbating it in particular ways that continue to affect the programs they are able to offer these students. I would also note the way that they have managed this by how they have organized their classrooms ends up really impacting the kids, right, that essentially if you are concentrating Head Start students in particular classrooms, the result of that is those kids don't have the same educational experience. That one of the things we know about children is that when they are mixed across races and across income groups, that that helps the kids at the bottom by being surrounded by other children from different backgrounds. And that is not possible when we have to organize our classrooms in the way that we have done. Let's go on to the statutory authorization for this. And for me, it seems like the question is, is this another, is this Biden v. Missouri redux, or is it more like all the other cases where vaccine mandates have been struck down? So that seems to me, I mean, I am looking at Biden v. Missouri trying to see what the parallels are and what the differences are. Is that the way you look at it, or do you have some other way of distinguishing? It seems like Biden v. Missouri is the case you really have to overcome. I would say Biden v. Missouri is the one case the government has going for it, whereas on our side we have the OSHA case, both Tiger Lilly cases, now the federal contractor case from this court. And so really it is the government's burden to show why the majority of cases on this topic are somehow wrong. But notwithstanding that, give us your argument for why you think Biden v. Missouri doesn't control here. Yes, so I think it is two things, Your Honor. One, Biden v. Missouri, the statute is very specific language that allows the Secretary to protect the health and safety of participants in the Medicaid and Medicare program. That is the phrase used in the statute, that there is a provision that he can protect the health and safety interests of participants in the program. But there is some language in this statute talking about health and safety as well. It is, Your Honor, but it is in a different section. It is not in the standard setting section. So the power that the Secretary has to set standards is standards around facilities or standards around administrator or financial management. The health and safety is about what happens when there is a deficiency in how a program administers or goes about implementing those performance standards. So if there is a performance standard that causes a health and safety threat to children, for instance, there are rusty nails on a playground is one of the examples in the previous case law. Well, that is a health and safety problem and so the department can act immediately. But you can't take the deficiency language and create a performance standard on it. I believe there is a history here where there has been requirements of medical examinations of the staff. That is correct. Do you believe that ICF has the statutory authority to require that? So I would say two things. First, as this Court pointed out in the federal contractor case, the fact that an agency has asserted a power in the past doesn't mean it has that power. It just means that it has asserted it. Are you taking the position they didn't have the authority to even order that? So I would say this comes down to appropriate. This Court has to interpret the term appropriate. That is the best thing the government has going for it in the statute. And two things are important on appropriate. One is the major questions doctrine. I don't see a routine screening as a major question in the same way as a nationwide vaccine mandate. The second thing I would say, though, and this is from Judge Larson's dissent in the OSHA panel case, is that it matters not only the type of power, but also the degree or kind of power. A routine physical examination is far different from a vaccine mandate that, as this Court again pointed out in Judge Sutton's OSHA dissent, you can't turn on or off when you leave work. So I would say that they are different in kind and degree and also different because of the major question. But you're not taking the position that they didn't have the authority to do that? That's not something we're taking position on either way today. You're just saying it's distinguishable? Absolutely, Your Honor. Ms. Clark for the Secretary. May it please the Court, Sarah Clark for the United States. The motions panel rightly concluded, based on the Supreme Court's reasoning in Biden v. Missouri, that the Head Start IFR here is within the Secretary's authority. And I want to highlight three key similarities between this case and Missouri. And I'll come back to each. So first of all, they both involve federally funded programs that are deeply concerned with improving and protecting the health of the people within the program's care. Before you go further, are we bound by the motions panel's decision? So I think at the very least, the motions panel decision is highly persuasive. So obviously it was addressing whether there should be an injunction pending appeal. But of course, their reasoning was on plaintiff's likelihood of success. So we haven't taken a position on whether it's strictly binding. But of course, their reasoning, I think, is quite powerful here. And they picked up on, of course, that this case is very similar to Missouri v. Biden. So we have that it's a federally funded program with people in the program's care. In addition, as Your Honor pointed out, there is specific statutory language here that confirms that health and safety standards are within the Secretary's authority. Plaintiffs have never challenged those health and safety standards in the past. Let me ask you how the ACF and HHS have interpreted that authority through the years before they got to the interim rule. As I understand Missouri v. Biden, the CMS there was actually regulating medical treatment facilities, hospitals, and the like, dealing with elderly, disabled, and sick people. Here, these are not elderly, disabled, or sick people. They're children who probably, it seems like the statistics show they're not as immune, or they're more immune to the bad effects of COVID-19. But anyway, the history here has been, as best as I can see, the most that HHS has ever required are these medical exams and also testing for TB. Anything else that they've required of the staff relating to medicine or medical related things? Well, certainly they've always had, in addition to the required initial and periodic examinations and screenings, they've also had a number of other infection control measures, much as the Medicare and Medicaid programs had. So for example, in the 1990s standards, which were in place for two decades, there were very specific regulations about hand washing, glove wearing, disinfecting, spacing of cots, and those were expressly designed to protect the safety of the children in the program's care. And to your Honor's point about hospital versus the Head Start program, it's true that the populations are different, but there's still the same position of trust over vulnerable people. So at the time the IFR was issued, of course, there were no vaccines for young children. Delta was causing an increase in hospitalizations for children. So there was no basis for the secretary to take those concerns. What percentage of Head Start staff are medical professionals? I don't have that information, Your Honor. Is there anything in the record to indicate how many medical professionals are on the staff? My impression of all this is that the Head Start program is referring students out to medical professionals who maybe give the treatment at another facility. It may come to Head Start, but it's always done by a medical professional who's not on the staff. Am I missing something here? So whether or not specific programs have medical professionals on staff, there is a very close and intertwined relationship between the Head Start program and the medical services. So obviously health services are a major part of the Head Start program, and that's because obviously these children being healthy is essential to their ability to thrive. Right. But your understanding is, I mean, these are educators. Their jobs are to be educators, not doctors. Wouldn't you agree with that? I agree, but I want to highlight, right, these people are taking care of children in a holistic way. So they're not just teaching these children their ABCs. They're helping them brush their teeth. They're looking at them themselves and seeing if they observe any health issues. They're changing their diapers. Right. This is not a kind of teacher in the classroom situation. This is a much more comprehensive program that is very deeply concerned with children's health. So in that sense, they are quite analogous to medical professionals, even without being doctors themselves. Is the same thing true of many a kindergarten teacher in a public school? I mean, maybe they're not changing diapers at this point, but if you ask any public school teacher, they're like wiping noses and they're providing warm coats for people and they're referring them to social workers, and they're getting all of these sorts of services for young children. I mean, is there really a strong line you want to draw here? Well, again, I'm just trying to emphasize that health and safety are a very important part of this program and that staff are an important part of that. And that's why the Head Start standards, since their very first days in the 1970s, have always required that staff ensure that. But it's not limited. There's no reason why that couldn't extend to programs other than Head Start. Well, Head Start, of course, is a federally funded grant program. So these are the terms that the Secretary has set it for. Right, but if you wanted to make a grant program that applied to any K-12 public school that receives federal funds, which might be quite a few of them because they get school lunch programs and things like that, there's no limiting principle about the kinds of activities performed in the Head Start program that would distinguish it from kindergarten or pre-K. I just agree, Your Honor. I think the Head Start program and the requirements it sets out as sort of further reinforced by its purpose make clear that this is designed for a specific population. It's designed to make sure these low-income children make it to kindergarten healthy and ready to learn. Sure, but again, I'm just thinking about the next case, right? All kinds of federal grant programs, school lunch programs, are designed for kids who are in low-income situations, right? Then here, I would point, Your Honor, to the fact that there has been this robust history of health and safety regulations in this program. Again, that plaintiffs don't really attempt to dispute, nor could they dispute. How have the regs for ACF and HHS dealt with vaccines in general for kids and staff? So for staff, it's correct that they haven't required a vaccine in the past. Has there been any kind of regulation that's ever said, you have to comply with local or state regulations as far as vaccines go? No, the standards haven't mentioned vaccines in the past. Of course, the same was true in Missouri, and that was not a barrier to concluding that that requirement was within... But there was a recognition in Missouri that there were these local regulations that required the vaccines, and that was understood. Is there anything in the record here where it's understood that the staff are supposed to get local vaccines on a regular basis as a requirement of the job? So there's not much in the record on that specifically, Your Honor. But of course, I'll point out, because many schools have vaccination requirements, staff would typically have had the sort of normal suite of vaccines. And the reason why they wouldn't have COVID vaccines, of course, is because the COVID vaccine is new. So there is not the same backdrop with COVID as... And what are the requirements for the children in the program with respect to vaccines? So for students, the way it's set up is staff need to make sure that they have doctors assess whether they're up to date on their vaccines, as recommended by the CDC, and then assist parents in helping bring the child up to date. So suppose the child's parents said, I don't want my child to get a vaccine at the local level. Would they be kicked out of the program because of that? Based on my reading of the standards, no, Your Honor, they wouldn't be kicked out. But of course, the program is trying to make sure that kids are vaccinated to protect them from the standard range programs. Here, of course, we're concerned with making sure the staff don't spread communicable diseases. Were there any studies made? I guess in this case, none of the children could have been vaccinated. Exactly. Is that changed? That's changed now. That has changed now after the district court's decision. And to some of Your Honor's questions earlier, of course, the question is whether the district court abused its discretion back in March when it denied the preliminary injunction. And then beyond that, of course, what the secretary was doing. So we ignore everything that's happened in the last year. So for purposes of this preliminary injunction appeal, Your Honor, yes, because the question is what was before the district court at the time? And of course, what was before the secretary when he issued the IFR? So for this appeal where plaintiffs are seeking the extraordinary remedy of a preliminary injunction, those considerations are outside the scope. And I take it. I know it's not in our record, but I'm just asking, has HHS or ACF actually tried to do any kind of natural experiment to look and see what's happened in these programs that have been enjoined across half the country versus those that have not been enjoined? So what I can tell you, I can point you to the final rule on masking. And so, of course, that only address addresses masking. It's not addressing vaccines. But the agency did look to what has happened in states where this was enjoined and what has happened in states where it hasn't. Not super in the weeds in the rule, but they certainly take that into account. And I think what we see there, I think the most salient observation they had for our purposes is that staff departed in much smaller numbers than plaintiffs, for example, had been positing. Was there an incident of more COVID infections in the states that had the enjoined vaccine versus those without the injunction? I don't believe the rule addresses that, so I'm not aware of data on that front. Can I ask you a couple of questions? One, just on this practical, why did the government not appeal when it did? And now you come to this court and you say, boy, this rule is so important. We absolutely must have this rule. It just makes me scratch my head a little bit. Well, so preliminarily, of course, it's plaintiff's burden here to show that a preliminary injunction is warranted. But as to the PIs in the other states, those cases proceeded fairly promptly to full merits briefing, to summary judgment. And they also came before the Supreme Court's decision in Missouri. So what happened in those cases is the district courts were soon thereafter given a chance to opine on those challenges with Missouri as the backdrop. And so far, we only have a decision from the Louisiana case, but the government has appealed the Louisiana decision to the Virginia case as well. And yes, the Fifth Circuit case is on appeal. The opening brief is due in a little over a month. Okay. So as far as your statutory authorization for this mandate, I mean, you rest primarily on administrative and financial management standards. And of course, you don't claim it's a financial management standard, but you claim it's an administrative standard. And I'm sure you can appreciate that that's pretty broad. You're trying to cram a lot of specific authority into a very broad category. So what limits would you give us on the term administrative that would not mean you can do anything you want to do? So one preliminary point I just want to highlight. I don't think we rely primarily on that one over the other three sources of authority. But as to the question of what limit is there on administrative, I think we can look to, one, the fact that this regulation goes to the heart of the program's ability to keep their doors open and to operate full stop, especially safely during a winter surge. So it's kind of right at the heart of what administrative would be. And in addition, the court can be... I mean, that sounds pretty boundless, right? Again, like anything that will keep the doors open or the lights on is administrative. I'm not suggesting that... Well, we don't have any information in this record about what happened. I mean, are you denying that these other states have Head Start programs that are up and running? So I certainly acknowledge they have Head Start programs. We don't have anything in the record, nor is there anything to provide a basis for judicial notice that tells us how well they've been able to stay open or how well they've been able to provide services. So I don't think there's any cause to conclude that, especially... And even setting aside, I guess, the fact that that would be after the district court's decision denying a PI here. But to come back to administrative, of course, we have limits from the nature of the program, the purpose of the program, and also from the specific considerations enumerated in the statute that the secretary is required to consider. But of course, if this court disagrees that this is an administrative standard, it could rule on one of the other categories. For example... Are you relying upon the reasoning of our motions panel for upholding it? They looked at a completely different provision. May I briefly conclude? Sure. My time is up. So my reading of the motions panel decision is that they recognized that there were these categories of standards that the secretary is authorized to act in. And they specifically highlighted appropriate, but they mentioned that there were other enumerated categories. And any one of those categories would provide a sufficient basis here. So we certainly agree with the motions panel reading, but any one of those categories would be suitable. And of course, the motions panel recognized the additional persuasive value that the other statutory language about deficiencies adds here, where it confirms that this kind of health and safety regulation is well within the secretary's authority. Okay. Do we have any other questions? Okay, counsel. Thank you very much. Is there a rebuttal? Thank you, Your Honor. I'll make just one factual clarification and then a few legal points. So as long as we're operating a little informally and outside the record on the current situation, I'm told that Levingston currently does have openings in its Head Start program that are not filled, and that they've had a challenge filling for somewhat of a significant amount of time. And the way they've been fixing that is that administrators have been substitute teaching in those classrooms, but that that obviously has put a significant strain on the administrative staff. Okay. But none of that is in the record. Correct. Yeah, just to the question about mootness, not about, yes. Okay, that's fair. I'm also informed that not all the staff is vaccinated, that a number of staff members have applied for exemptions, and that the program has granted those exemptions, but that as part of its review, HHS could consider whether those exemption grants were appropriate and could reject them. The one other just factual point, Levingston has one nurse on staff to this question about how much medical staff is available, but their role is really to coordinate the care that is provided by outside providers. Has there ever been a medical procedure like vaccinations themselves dispensed at the Levingston facilities? Not that I'm aware of, Your Honor, no. So if I can turn to the law then and just make a couple clarifications from what opposing counsel said. The first is she said that there is a health and safety authority to set standards. And that I think is just inaccurate. There are performance standards, and the performance standards are the ones you've been discussing, the condition of facilities, administrative financial management, otherwise appropriate. Separately, there is a deficiency section that says if you fail one of those performance standards as a program, this is how we respond as an agency, as a department. If a failure is an everyday failure, then we go through this paperwork process. If a failure endangers the health, safety, or civil rights of students or staff, then we can take immediate action. But I think it is wrong to go into the deficiency section and smuggle it back to say, well, now we have a power to set performance standards. Because it's not in the list of things you can set performance standards on. There's no health and safety reference there. I think that's one of the things that distinguishes this case from the Biden versus Missouri case. I think it's also notable that in the rule itself, the government does not rely on the deficiency section. When the government first wrote this rule, they didn't think that gave them this authority. It's only after litigation has started that the government has started relying on that health and safety language. Is it your understanding that under Chenery, they are bound with respect to not just their reasoning, but the authority that they cited? They can't switch gears here? So we've mentioned cases from both the 8th Circuit and the D.C. Circuit. I'm not familiar with Tenery, Your Honor. No, Chenery. That's the kind of D.C. Circuit. Yes, that they are limited to what they put forward in the rule. So the second question I wanted to address was the question about the motions panel. I agree with the government that it is persuasive. It is something that obviously deserves respectful consideration, but that it's not binding. And the one important distinction I would make, obviously we've all been dealing with shadow docket cases and what level of precedent we assign them. But the other important distinction I would make that the government didn't mention is that the motions panel did not have the benefit of the Supreme Court's West Virginia decision. And I think the West Virginia decision really helps clarify the major questions doctrine, which I believe applies here. And the motions panel didn't have that value. How did West Virginia clarify the major questions doctrine? What did it add? So I think in West Virginia, the court laid out that a major question is something that affects a national, political, or economic issue. Obviously, usually when we've thought about major questions, they've been major economic questions. But I would say that a national vaccine mandate is also a major political question. In this instance, it's affecting over a million people. But it's also a major salient political question in our society. And that's the sort of thing that would be appropriate for Congress rather than an agency. Maybe to paraphrase Justice Scalia, I don't think Congress hides national vaccine mandates in mouse holes. And that's the sort of theme that I take from West Virginia that would have been helpful for the motions panel. Okay. Well, thank you, counsel. We will take the case under submission. The clerk may adjourn the court.